Anofrio D. DE FILIPPIE
v.
WATERMAN STEAMSHIP COR-
PORATION.

No. 279 of 1953.

United States District Court
E. D. Pennsylvania.

Oct. 25, 1956.

Dorfman & Pechner, Philip Dorfman, Bernard Sacks, Philadelphia, Pa., for plaintiff.

Rawle & Henderson, Thomas F. Mount, Philadelphia, Pa., for defendant.

KRAFT, District Judge.

This is a suit in admiralty by a merchant seaman to recover from the owner of the vessel on which he was employed for personal injuries sustained while engaged in the performance of his duties aboard the vessel. The libellant claims that the owner failed to provide him with a safe place to work in that a short hatchboard tilted, causing him to fall into the hatch to the deck below. The owner denies this and asserts that libellant carelessly jumped or stepped backwards from the top of an abutting guard rail into an opening in the hatch cover of which libellant was aware. From the conflicting evidence presented the court makes the following Findings of Fact

1. Waterman Steamship Corporation, respondent, is an Alabama corporation which, at the time here material, owned, operated and controlled the vessel S. S. Yaka.

2. The S. S. Yaka, at the time here material, was engaged in intercoastal commerce.

3. The libellant, Anofrio D. De Filippie, is an American citizen who, at the time of his injury, was 44 years of age. Since 1943 he had been and was, at the time here material, a merchant seaman in the United States Merchant Marine.

4. On or about June 25, 1952, libellant signed articles for an intercoastal voyage as deck engineer in the crew of the S. S. Yaka at $329.50 per month plus overtime, found, bonus and allowance.

5. On August 3, 1952, about 3:50 P.M. while the S. S. Yaka was proceeding in calm water up the Willamette River en route to Portland, Oregon, the libellant sustained severe leg injuries in a fall to the No. 4 tween-decks.

6. Abutting the after coaming of the vessel's No. 4 hatch was a guard rail of angle steel so constructed that the upper surfaces of its two horizontal rails were flat and approximately three inches wide. The distance from the top of the hatch cover of the after section of No. 4 hatch to the top of the guard rail was about 22 inches.

7. Slightly below the level of No. 4 hatch cover and immediately aft of the guard rail at the after end of No. 4 hatch was a winch platform on which were located port and starboard steam winches with appurtenant controls and enclosed steam pipes.

8. Directly above this winch platform was another platform (hereafter called upper control platform) so constructed that its forward end was flush with the guard rail upon the top rail of which rested the two forward vertical supports of the upper control platform. This platform was also equipped with a guard rail.

9. On the upper control platform were the respective controls and valves for the operation from that platform of

the two steam winches on the platform below.

10. The steam valves on the upper control platform projected two or three inches above the floor. One valve was on the starboard and the other on the port side of this platform, each being 8 to 12 inches aft of the forward edge of the platform. The related controls were a few inches aft of the respective valves.

11. The distance from the top guard rail to the floor of the upper control platform was between three and four feet.

12. A stair or ladder at the forward end of No. 5 hatch afforded a means of safe access to the upper control platform.

13. About 1 P.M. on August 3, 1952, the hatch cover of the after section of No. 4 hatch was exposed by removal of the cleats and three tarpaulins. Next two hatchboards, each 9 ft. 5 in. long, 20 in. wide and 3 in. thick, were removed from approximately the center of the after section of No. 4 hatch to give a crew gang access to the ladder in the center of the after coaming of that hatch section to enable them to descend to the No. 4 tween-decks and thence to No. 4 hold which they were to clean. One removed hatchboard was placed on top of the hatchboard immediately to the starboard and the other on top of the hatchboard immediately to the port of the opening created by the removal of the two hatchboards.

14. An I-type steel king beam was at the forward end and the steel after coaming of the hatch at the aft end of this opening. An I-type steel queen beam was midway between, leaving a clear distance of 4 ft. 3½ in. between the lip of the after coaming and the after edge of the queen beam.

15. Shortly after 1 P.M. the libellant, who was working on a nearby winch, saw that the tarpaulins had been pulled back and this opening made approximately in the center of the hatch cover of the after section of No. 4 hatch. From then until the time of his injury libellant knew of the continuous existence of this opening.

16. About 3:50 P.M., instead of using the stair or ladder at the forward end of No. 5 hatch to ascend to the upper control platform, the libellant mounted the guard rail which was between the after end of No. 4 hatch and the abutting winch platform and, facing aft, inspected and/or tested the valves and/or controls on the upper control platform.

17. Upon completion of this inspection and/or testing, the libellant stepped or jumped backwards from the guard rail on which he was standing, without looking in the direction in which he was moving, intending to alight on the hatch cover of the after section of No. 4 hatch, either believing that he was safely beyond the hatch opening or forgetting, for the moment, its existence.

18. Libellant's place and manner of descent from the guard rail caused him either to fall directly into the aforesaid hatch opening aft of the queen beam to a point near the ladder on the tween-deck below or to land very close to the edge of that opening upon the top hatchboard upon which he slipped, the force of his descent and loss of balance carrying him into and through that opening to a point near the ladder on the tween-deck below.

19. Had libellant looked to observe where his intended movement would take him before stepping or jumping from the guard rail, he would not have suffered his fall and the attendant injuries.

20. Libellant's fall to the tween-deck was not caused by his walking or stepping upon any hatchboard of insufficient length or stability.

21. Libellant was not precipitated to the tween-deck by the downward tilting of any hatchboard upon which he walked or stepped.

22. No hatchboard fell to the tween-deck at the time of libellant's fall.

23. No hatchboard of the No. 4 hatch cover was displaced or disturbed at the time of libellant's fall except the two hatchboards which had been removed about three hours earlier to provide access to the ladder.

24. The vessel, S. S. Yaka, together with its appurtenances and appliances, was seaworthy at the time of libellant's fall and consequent injuries.

### Conclusions of Law

1. The court has jurisdiction of the parties and of the subject matter.

2. The libellant was negligent and his negligence was the sole proximate cause of his injuries.

3. The respondent did not breach its continuing, nondelegable duty to libellant to provide him with a safe place in which to work.

4. The respondent was not negligent.

5. The libellant's injuries were not caused or contributed to by any unseaworthiness of the vessel, S. S. Yaka, its appurtenances or appliances.

6. The libellant may not recover from the respondent.

### Order

And now, October 25, 1956, judgment, with costs, is entered in favor of respondent, Waterman Steamship Corporation.